HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| NATIONAL FOOTBALL SCOUTING, INC., <br><br> Plaintiff, <br><br> v. <br><br> ROB RANG, et al., <br><br> Defendant. | CASE NO. 11-cv-5762-RBL <br><br> ORDER ON SUMMARY JUDGMENT |

  THIS MATTER is before the Court on both parties' Motions for Summary Judgment. (Dkt. #31 & 41.) The underlying case involves an alleged copyright infringement and misappropriation of trade secrets. Plaintiff National Football Scouting (National) compiles yearly Scouting Reports for twenty one National Football League clubs to use during the Draft. In the Reports, National assigns each player an overall Player Grade, which is a numerical expression representing National's opinion of the player's likelihood of success in the NFL. The Scouting Reports are copyrighted as unpublished works and shared only with member clubs.

Defendant Robert Rang is a part-time sports writer who writes about the NFL Draft on Defendant Sports Xchange's website.[1] From 2010 to 2011, Rang published eight articles discussing Player Grades for eighteen college players. National sent Rang a series of cease and desist letters that went largely ignored before it sued for copyright infringement and misappropriation of trade secrets.

Rang seeks summary judgment, arguing that the Player Grades are not copyrightable, that his use of the Player Grades was protected under the "fair-use" doctrine, and that a subjective opinion is not entitled to protection as a trade secret. National responded with its own motion for summary judgment, arguing that the Player Grades are copyrightable as numerical expressions of an opinion, that the fair-use doctrine offers no protection for Rang's bad-faith dissemination of unpublished work, and that the fact that National assigned a particular Player Grade is a trade secret. Rang seeks summary judgment on the trade secret claim, but argues in the alternative that the issue should go to a jury.

For the reasons stated below, Defendants' Motion for Summary Judgment on the copyright claim [Dkt. #31] is GRANTED. Plaintiff's Cross Motion for Summary Judgment on the copyright claim [Dkt. #41] is DENIED, and the copyright infringement claim is dismissed. Defendants' Motion for Summary Judgment on the trade secrets claim [Dkt. #31] is DENIED. Because there are genuine issues of material fact, Plaintiff's Cross Motion for Summary Judgment on the trade secrets claim [Dkt. #41] is also DENIED.

## I. BACKGROUND

Plaintiff National Football Scouting is a scouting organization whose sole purpose is to provide Scouting Reports to its shareholders—twenty one different National Football League

---

[1] The Court will refer to the defendants collectively as "Rang."

1  Clubs. National's scouts travel the country to evaluate college talent and to discover player
2  information for the Scouting Reports. (Compl. at 4.) National then organizes the information
3  into Reports and copyrights them as unpublished works. (Cross Mot. for Sum. J. at 3.) The
4  Reports include six pages of information on each prospective draftee, including injuries, the
5  player's morals and family background, and the player's college statistics. (Def. Reply and
6  Resp. at 2–3.) Based on the player's information, National assigns over-all Player Grades.
7  (Compl. at 4.)

8  Member Clubs each pay $75,000 per year for the Reports. (Foster Dec. at 2.) National's
9  contract with its member Clubs "contain strict confidentiality provisions and significant penalties
10 for breach of those obligations." (*Id*. at 4.) The contract states that "the scouting information
11 (including the grades) in the Scouting Reports are trade secrets that derive independent economic
12 value from not being generally known." (*Id*.) National also has confidentiality agreements with
13 the computer consulting company it employs to convert the data into electronic files. (*Id*. at 5.)

14 Defendant Sports Xchange is a media company that hosts its own Internet websites.
15 (Mot. for Sum. J. at 3–4.) Defendant Robert Rang is a full-time high school teacher who
16 moonlights as a sports writer for Sports Xchange. He is currently a senior NFL Draft analyst for
17 one of Sports Xchange's website, NFLDraftScout.com. (Rang Dec. at 2.) During 2010–2011,
18 Rang published eight articles on NFLDraftScout.com about players eligible for the upcoming
19 draft. (Compl. at 6–8.) Six of the articles disclose National's Player Grade, while two of the
20 articles merely allude to the prospective draftees rank among other players. (Rang Dec. Ex. A–
21 H.) In total, Rang disclosed eighteen Player Grades.

22 National wrote a series of letters to Rang, demanding that he stop infringing on their
23 copyright and disclosing their trade secrets. (Foster Dec. at 8–9.) A telephone call from
24

1  National's attorneys followed every letter. (*Id.*) Despite this series of warnings, Rang continued
2  posting the Player Grades. In September 2011, National sued Rang and Sports Xchange for
3  copyright infringement and misappropriation of trade secrets.
4       Both parties now seek summary judgment. Rang argues (1) that the Player Grades are
5  not copyrightable, (2) that the articles made fair use of the Player Grades, and (3) that the Player
6  Grades are not protected trade secrets. National argues that the opposite conclusions can and
7  should be reached as a matter of law.

## II. ANALYSIS

9       Summary judgment is appropriate when, viewing the facts in the light most favorable to
10 the nonmoving party, there is no genuine issue of material fact which would preclude summary
11 judgment as a matter of law. Once the moving party has satisfied its burden, it is entitled to
12 summary judgment if the non-moving party fails to present, by affidavits, depositions, answers to
13 interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for
14 trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "The mere existence of a scintilla of
15 evidence in support of the non-moving party's position is not sufficient." *Triton Energy Corp. v.*
16 *Square D Co.,* 68 F.3d 1216, 1221 (9th Cir. 1995). In other words, "summary judgment should
17 be granted where the nonmoving party fails to offer evidence from which a reasonable [fact
18 finder] could return a [decision] in its favor." *Triton Energy*, 68 F.3d at 1220.

19 **A. Copyright Infringement**

20      To establish a copyright infringement claim, the owner must prove two elements: (1)
21 ownership of a valid copyright and (2) copying of original elements of the work. *Feist*
22 *Publications, Inc. v. Rural Telephone Service Company, Inc.*, 499 U.S. 340, 345 (1991). While
23 the parties do not dispute that Rang copied the Player Grades, Rang argues that the Player
24 Grades are not a valid copyright and that, even if they are, he is entitled to the fair use defense.

1. <u>Valid Copyright</u>

Rang argues that the Player Grades lack the originality required for copyright protection. National argues that, although the Scouting Report is copyrighted as a compilation, the Player Grade is copyrighted as a text expression of a professional opinion. "To qualify for copyright protection, a work must be original to the author." *Feist Publications, Inc. v. Rural Telephone Service Company, Inc.*, 499 U.S. 340, 345 (1991) (citation omitted). Although compilations of facts may be copyrightable, "[t]he mere fact that a work is copyrighted does not mean that every element of the work may be protected." *Id*. at 348. Courts have held that telephone numbers in phone books are not copyrightable, *see id.* at 365, and part numbers are not copyrightable. *See Southco, Inc. v. Kanebridge Corp.*, 390 F.3d 276, 282 (3rd Cir. 2004).

But a numeric expression of a professional opinion can be copyrightable. *See generally CDN Inc. v. Kapes*, 197 F.3d 1256, 1260 (9th Cir. 1999) ("What CDN has done is use its own judgment and expertise in arriving at [the value of the coin] for the dealers. This process imbues the prices listed with sufficient creativity and originality to make them copyrightable."); *CCC Information Services, Inc. v. Maclean Hunter Market Reports, Inc.*, 44 F.3d 61, 67 (2nd Cir. 1994) (concluding that valuations and predictions based on a multitude of data sources were original creations). In *CDN Inc.*, the court concluded that CDN's price lists, which estimated the present value of certain goods, contained the requisite "'minimal amount of creativity' demanded by the Constitution for copyright protection." *See CDN Inc.*, 197 F.3d at 1260.

National's Player Grades, unlike telephone numbers, are not facts; they are "compilations of data chosen and weighed with creativity and judgment." *See CDN Inc.*, 197 F.3d at 1260. The Player Grades represent National's opinion, based on its data and its expertise, of a player's likely success in the NFL. Rang does not claim (and no evidence supports) that National uses a basic formula to arrive at its Player Grade. Thus, the element of creativity has not been removed.

The undisputed evidence shows National arrives at its grade through a weighing of subjective factors, such as personal character, leadership, and poise.  Much like valuing a product, "[t]his is not a process that is so mechanical or routine as to require no creativity whatsoever." *Id.* (citation omitted).

The Player Grades are copyrightable.  Because both parties agree that Rang copied original elements of the work, the only bar to National's recovery is Rang's fair-use affirmative defense.

2.  Fair Use

"The author's consent to a reasonable use of his copyrighted works had always been implied by the courts as a necessary incident of the constitutional policy of promoting the progress of science and the useful arts." *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 549 (1985).[2]  Therefore, "the fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright."  17 U.S.C. § 107.  Section 107 provides four non-exclusive factors to consider:

> In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
> (1) the purpose and character of the use, including whether such a use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

---

[2] Article 1, Section 8, Clause 8 of the Constitution gives Congress the power to enact laws protecting intellectual property: "Congress shall have Power . . . To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."

1  *Id*.  The "fair use analysis must always be tailored to the individual case," and the court must

2  weigh the results "in light of the purposes of copyright." *Campbell v. Acuff-Rose Music, Inc*., 510

3  U.S. 569, 552, 578 (1994).

4                                        *i.  Purpose and Character of the Infringing Work*

5         National argues that this factor disfavors fair use, pointing to the commercial nature of

6  the articles, Rang's bad faith desire to look like an "insider," Rang's repeated infringement after

7  cease and desist letters, and the lack of "newsworthiness" associated with the grades.  Rang

8  disputes these characterizations but argues that, even if true, this factor weighs in his favor,

9  because of the transformative nature of the articles.

10         One central purpose of considering the character of the work is to determine "whether the

11  new work merely supersedes the objects of the original creation or instead adds something new,

12  with a further purpose of different character, altering the first with new expression, meaning, or

13  message." *Campbell*, 510 U.S. at 579 (internal citations omitted).  The Ninth Circuit has

14  identified three principles to consider when determining the purpose and character of the work:

15  (1) news reporting; (2) transformation; and (3) commercialism. *Monge v. Maya Magazines, Inc.*,

16  688 F.3d 1164, 1173 (9th Cir. 2012).  In *Monge*, the court considered the interplay of the three

17  principles when a tabloid magazine published pictures of a celebrity couple's clandestine

18  wedding without the couple's permission. *Id*. at 1173–1177.  First, the court reasoned, that

19  although the magazine engaged in news reporting, "fair use has bounds even in news reporting."

20  *Id*. at 1173.  Next, the court determined that, despite the fact that each individual image was

21  reproduced in its entirety, the images were marginally transformed, noting the "text and article

22  accompanying the photos, as well as their arrangement in a photo montage." *Id*. at 1174.

23  Finally, the court determined that the magazine's "minimal transformation of the photos [was]

24

1   substantially undercut by its undisputed commercial use." *Id*. at 1177.  The court concluded

2   that, based on those considerations, "the first factor [was] at best neutral." *Id*.

3        Here, Rang did not publish a wholesale list of the Player Grades; instead, he recited a

4   grade and provided original commentary on the players and their draft prospects in his view.

5   National suggests that Rang's articles are not transformative because much of the information in

6   the articles focuses on information that is in the public domain.  But there is no rule that material

7   in the public domain cannot be used to transform copyrighted information.  Rang took material

8   in the public domain, the player grades, and his original thoughts to create his original

9   commentary on the players.

10       Although National argues that its grades are not newsworthy, it is not for the Court to

11  decide what is and what is not newsworthy. In any event, whether the Player Grades are

12  newsworthy is only one part of the factor that the court considers.  Although it is undisputed that

13  Rang's articles are for a commercial use, when the use of the copyrighted material is highly

14  transformative, as it is here, the commercial use is less significant. *See Campbell*, 510 U.S. at

15  579 ("[T]he more transformative the new work, the less will be the significance of other factors,

16  like commercialism, that may weigh against a finding of fair use.").

17       National also suggests that the Court should consider Rang's "bad faith."  First, National

18  points to its repeated cease and desist letters.  However, if Rang was entitled to protection under

19  fair use, the letters add nothing to the analysis because Rang would have been entitled to ignore

20  them.

21       National next claims that, because Rang did not consider the grades newsworthy, the

22  court should not consider them "news. National argues that Rang published the grades for the

23  sole purpose of looking like an "insider." Although a desire to be an "insider" is not necessarily

24

news reporting, Rang published these articles within the context of news stories relating to the draft. Rang has testified that the articles were interesting because it showed that the website was talking to people and forming opinions about players. (Dkt. #43 at 11.) There is no evidence that Rang posted the grades in a bad faith effort to undermine National's copyright. The evidence suggests only that Rang believed his use was fair, and thus continued to post news articles of interests to visitors of NFLDraftScout.com.

On balance, the transformative nature of Rang's articles weighs strongly in favor of finding a fair use.

*ii. Nature of the Scouting Reports*

The second factor in a fair use determination is the nature of the copyrighted work. National argues that this factor weighs in its favor because the Scouting Reports are unpublished. Rang responds that this factor is less important because of the transformative nature of Rang's articles, noting that the unpublished nature of the work is only one part of only one factor the court considers when determining fair use.

"This factor calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586. Thus, "works that are creative in nature are closer to the core of intended copyright protection than are more fact based works." *Kelly*, 336 F.3d at 820. Although Section 107 provides that the unpublished nature of a work does not bar a fair use finding, "the unpublished nature of a work is a key, though not necessarily determinative, factor tending to negate a defense of fair use." *Monge*, 688 F.3d at 1177.

The Scouting Reports were registered as unpublished works. Rang's disclosure of some of the Player Grades deprived National of its right of first publication, including "not only the

choice whether to publish at all, but also the choices of when, where, and in what form first to publish a work." *Harper & Row*, 471 U.S. at 564. Although the player grades are not pure creative expressions and National did not create them to promote science or the useful arts, the Player Grades are minimally creative and entitled to protection as unpublished works. Thus, the unpublished nature of the Scouting Reports weighs in National's favor.

### iii.   Amount of the Work Infringed

National concedes that Rang used a small portion of the copyrighted work, but it argues that the player grades are the heart of the scouting reports. Rang argues that he used less than .001% of the entire copyrighted work and that, even if the grades are the "heart" of the work, he published only a small percentage of the heart.

"The inquiry under this factor is a flexible one, rather than a simple determination of the percentage of the copyrighted work used." *Monge*, 688 F.3d at 1179. The court must examine both the quantitative and qualitative aspects of the portion of the copyrighted material taken. *Id*. at 1178. Generally, "the extent of permissible copying varies with the purpose and character of the use." *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820 (9th Cir. 2002) (concluding this factor was neutral when a search engine displayed an entire copyrighted image because the entire image was necessary for the search engine's purpose). When considering the quality and importance of the portion taken, the court looks to see "whether 'the heart' of the copyrighted work is taken." *Elvis Presley Enterprises, Inc. v. Passport Video*, 349 F.3d 622, 630 (9th Cir. 2003), *overruled on other grounds as stated in Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 995 (9th Cir. 2011).

Even if the amount of infringed material is small, a court may find that this factor weighs in favor of the owner if the infringing material is the focal point of the use. *See Harper & Row*

*Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 565–66 (1985). In *Harper & Row*, the Court determined that this factor weighed in favor of the owner when the words quoted in an article "were selected . . . as among the most powerful passages in the chapter," and the article was "structured around the quoted excerpts which serve[d] as dramatic focal points." *Id*. The Court concluded that "[the user] quoted these pages precisely because they qualitatively embodied Ford's distinctive expression." *Id*. at 565.

But if an alleged infringer can only achieve his purpose by copying the "heart" of the work, using the heart of the work might be a fair use. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 588 (1994) ("In parody, as in news reporting . . . context is everything, the question of fairness asks what else the parodist did besides go to the heart of the original."); *see also Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 613 ("Neither our court nor any of our sister circuits has ever ruled that the copying of an entire work *favors* fair use. At the same time, however, courts have concluded that such copying does not necessarily weigh against fair use because copying the entirety of a work is sometimes necessary to make a fair use of the image.") (concluding the factor did not weigh against fair use when the user copied images and scattered them among other images and texts).

The parties agree that the portion of the copied material is small in comparison to the entire Scouting Report. In the Scouting Reports, each player has six pages of detail, and Rang published only the overall Player Grades of eighteen players out of hundreds. Even if the Player Grade is the most valuable part of the Scouting Reports, Rang took a small portion of the most valuable part. The player grades mean little without the context of the other grades to show where a player ranks.

1       And here, unlike the news stories in *Harper & Row*, Rang did more than use the Player

2  Grades as focal point of news articles.  Although the articles mentioned the player grades, the

3  purpose of using the player grades was to provide original commentary on the player.  Rang used

4  the Player Grade in the context of a jumping off point to provide original commentary on the

5  player and his draft prospects. Based on the quantitatively small amount of copying and the

6  context of Rang's articles, this factor weighs slightly in Rang's favor.

7                    *iv.   Effect of the Infringement on the Market*

8       National argues that widespread infringement like Rang's would affect the value of

9  Scouting Reports.  Rang makes two arguments to supports his claim that the articles do not affect

10 National's market: (1) the articles and the Scouting Reports occupy different relevant markets

11 and (2) the cyclical nature of National's publication cycle (a different Report every year) ensures

12 that National's potential market for the Reports always remains unimpaired.

13      The effect on the market "is undoubtedly the single most important element of fair use."

14 *Monge*, 688 F.3d at 1180 (citing *Harper*, 471 U.S. at 566).  "[T]he market harm analysis is

15 affected by whether the harm is caused by commercial use of a mere duplicate or by commercial

16 use post-transformation." *Id*. at 1181.  If the use does not "materially impair the marketability"

17 of the original work, this factor may tend to favor fair use. *Harper & Row*, 471 U.S. at 567.

18 When a work is transformative, "it is more likely that the new work will not affect the market for

19 the original . . . because [the use] and the original usually serve different market functions."

20 *Monge*, 688 F.3d at 1182.

21      Rang correctly notes that (at least currently) the Scouting Reports and the articles

22 compete in two completely separate markets: National sells the Reports solely to its member

23 clubs, while Rang's articles are available to the public.  However, the potential market for the

24

Scouting Reports exists outside of just the National Football Clubs. National could reasonably decide to sell older versions of its Scouting Reports in the future. The determinative point is that, even if the Scouting Reports and articles were in the same market, the articles are not in any meaningful sense "a market substitute" or "market replacement." In fact, it is largely undisputed that Rang's articles are not a market substitute for the Scouting Reports.[3] Even if National attempted to sell its Scouting Reports to the public at large, Rang's disclosure of eighteen player grades does not compete directly with the material in the Scouting Reports, which includes six pages of information for each prospective draftee.

Even if the type of transformative commentary Rang has offered here becomes widespread, bloggers opinions of the a Player Grade is not a market substitute. The fact that National's direct competition—"BLESTO"—could obtain the grades from Rang's articles does not mean they are a market replacement. The notion that the only part of the Scouting Reports with value is the Player Grade, when National produces six pages worth of information on each prospective draftee, defies common sense. Even if National's direct competitors saw some player grades in Rang's articles, no evidence suggests that the competitor would be able to obtain a comprehensive picture of National's Scouting Reports. The undisputed facts demonstrate that Rang's online articles are transformative and do not decrease the market value for National's Scouting Reports. This factor weighs heavily in Rang's favor.

> *v. Balancing of the Factors*

When assessing the fair-use factors, the court "consider[s] these non-exclusive factors as a total package." *Monge*, 688 F.3d 1183. Rang's news articles transformed National's

---

[3] National even admits that Rang's eight articles "could not possibly serve as a market substitute for NFS's Scouting Reports." (Opp. and Cross Mot. at 16.)

copyrighted material into a commentary on prospective draftees. Rang did not use the Player Grades as a focal point of his article or create a whole-sale list of Player Grades; he used them only as a jumping off point to discuss Rang's own impressions of the player and his draft prospects.

Although the unpublished nature of the work weighs in National's favor, it is but one factor in the fair use analysis. One of the major concerns with infringement on unpublished works is that an un-authorized first publication will compete with and usurp the potential market for first publication. *See Monge*, 688 F.3d at 1182 ("Although the photos were unpublished until Maya printed them for commercial gain, after the publication of Issue 633, the bottom literally dropped out of the market—neither Maya nor anybody else is likely to purchase these pictures from the couple.") The transformative nature of Rang's articles does not interfere with the potential market for the Scouting Reports. The Scouting Reports are still valuable to the National Football League Clubs that order them, and even if National sought to sell them to the public, Rang's articles would not act as a market replacement.

The balancing of these factors weighs in favor of Rang's fair use. The only factor clearly tipping in National's favor is the nature of the copyrighted work. But there is no presumption that the unpublished nature of the work overcomes all of the other factors. Because Rang has proved fair use, Rangs Summary Judgment Motion on the Copyright Infringement Claim [Dkt. #31] is GRANTED. Plaintiff National's Summary Judgment Motion on the Copyright Infringement Claim [Dkt. #41] is DENIED.

**B. Misappropriation of Trade Secrets**

Under the Uniform Trade Secrets Act, REV. WASH. CODE 19.108, a plaintiff can receive damages for the misappropriation of trade secrets. The Act defines a trade secret as information

that derives economic benefit from not being generally known and is the subject of reasonable efforts to maintain secrecy:

> "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process that:
> **(a)** Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means, by other persons who can obtain economic value from its disclosure or use; and
> **(b)** Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

REV. WASH. CODE 19.108.010(4).

Rang argues that he is entitled to summary judgment on the trade secrets claim because a Player Grade does not qualify as "information," claiming that information is limited to factual information and that the player grades are subjective opinions. Rang argues that an opinion cannot be a protectable trade secret, pointing to the distinction between fact and opinion in the defamation context. However, this is not a defamation case, and First Amendment protection will not "vanish" for opinions in defamation cases if the player grade is given protection as a trade secret. This is a trade secret case. National responds that, although the grades are subjective opinions, what grade National ultimately assigns to college players is itself a fact with independent significance.

The definition of "information" under the Uniform Trade Secrets Act is a question of law, but the determination in a given case whether specific information is a trade secret is a question of fact. *Ed Nowgroski Ins., Inc., v. Rucker*, 137 Wash. 2d 427, 437 (1999). Thus, for Rang to obtain summary judgment on the trade secret claim, the definition of information must not include the fact that National assigned a Player Grade to a certain player.

Washington courts have not specifically addressed whether the fact that a business had an opinion can be "information" under the Uniform Trade Secrets Act. Although Washington has

adopted the UTSA, courts look at the Restatement (Third) of Unfair Competition for guidance on trade secret. *See Ed Nowgroski Ins., Inc.,* 137 Wash. 2d at 442–443. The Restatement defines a trade secret as "any information that can be used in the operation of a business or other enterprise and that is sufficiently valuable and secret to afford an actual or potential economic advantage over others." Restatement (Third) of Unfair Competition § 39. "The status of information claimed as a trade secret must be ascertained through a comparative evaluation of all the relevant factors, including the value, secrecy, and definiteness of the information as well as the nature of the defendant's misconduct." *Id*. cmt. d (1995).

When interpreting a statute, a court starts with the plain meaning. The fact that National awarded a grade to a player is "information" under the plain language of the statute. National has specifically identified the information that it claims is entitled to protection (the fact that a Player Grade was assigned), and Rang has failed to offer any specific support for his claim that the fact that National assigned a Player Grade does not fit the definition of "information."

Rang cites to California case law for the proposition that ideas are not protected as trade secrets. *See Silvaco Data Systems v. Intel Corp.*, 184 Cal. App. 4th 210, 220–21 (2010), *disapproved on other grounds by Kwikset Corp. v. Superior Court*, 246 P.3d 877 (Cal. 2011) ("In either case, the trade secret is not the idea or fact itself, but *information* tending to communicate (disclose) the idea or fact to another. Trade secret law, in short, protects only *the right to control the dissemination of information.*") (emphasis in original); *see also Agency Solutions.com, LLC v. TriZetto Group, Inc.*, 819 F. Supp.2d 1001, 1017 (E.D. Cal. 2011). But the fact that National has assigned a Player Grade to a certain player is not an idea or opinion.[4]

---

[4] Defendants citation also mischaracterizes the decision in *Silvaco*. The *Silvaco* Court did not hold that an opinion or idea could never lead to information that could form the basis of a trade secret claim; the court stated only that "it is the information—not the design itself—that must form the basis for the cause of action." *Id*. at 221–22.

Because the fact that National assigned a certain Player Grade is information, whether the grade is protected under trade secret law is a question for the trier of fact. A factual dispute exists over whether National has made reasonable attempts to preserve the secrecy of the information. Additionally, Rang has created a factual dispute over whether the grades receive economic value from not being generally known. Rang has offered evidence that the Clubs do not draft players according to the Player Grades, while National offers evidence that the fact that it assigns player grades has significance to almost everyone involved in the draft.

Whether the Player Grades are a trade secret is an appropriate question for the trier of fact. Rang's Summary Judgment Motion on the trade secret claim [Dkt. #31] is DENIED.

## II. CONCLUSION

Defendants' Motion for Summary Judgment on the copyright infringement claim [Dkt. #31] is GRANTED. The claim is dismissed with Prejudice. National's Cross Motion for Summary Judgment on the copyright infringement claim [Dkt. #41] is DENIED.

Defendants' Motion for Summary Judgment on the trade secrets claim [Dkt. #31] is DENIED. National's Cross Motion for Summary Judgment on the trade secret claim [Dkt. #41] is DENIED.

IT IS SO ORDERED.

Dated this 13th day of December, 2012.

Ronald B. Leighton
United States District Judge